# LEON RASST

*vs.*

## ABBOTT MORRIS.

*Sale of Land—Action for Price—Time of Default—Agreement
to Take Foreign Money—Evidence as to Value—Depo-
sitions—Non-Resident Witness—Rules of Court—
Short Note in Attachment—Variance—
Erroneous Instruction—Review.*

In an action by the vendor of land to recover part of the pur-
chase price in accordance with the contract of sale, *held* that a
contract, executed at about the same time, by which the holder
of the legal title to the land agreed to sell the land to plaintiff,
was admissible, as was the assignment of such contract by plain-
tiff to the defendant purchaser.                               p. 248

In an action for a balance of the purchase money of land,
which balance was to be paid in Mexican currency of a certain
issue, where plaintiff contended that what was given him as such
currency by defendant was counterfeit, *held* that it was incum-
bent upon plaintiff to show that he had used reasonable means
to ascertain whether the currency given him was genuine.

p. 249

Evidence as to the capital of a corporation, organized by
plaintiff, which formerly held title to the land sold, was prop-
erly excluded as immaterial.                                   p. 249

The exclusion of a certain letter is not reversible error if it
was subsequently introduced and read to the jury without objec-
tion.                                                          p. 249

The admission of defendant's application for a title insur-
ance policy, and of a plat of the property sold, was not cause
for reversal.                                                  p. 249

Testimony, if inadmissible, should be objected to when
offered, unless its inadmissibility could not be known at that
time.                                                        **p. 250**

That a witness was, at a certain time, attorney for a party to the case, as well as of a title company which was investigating the title, does not render his evidence as to transactions occurring at that time inadmissible, unless this involves the disclosure of confidential communications. p. 250

Where the right of the owners of a leasehold interest to redeem from a re-entry by the landlord had expired, that a witness was asked whether this was the case was not cause for reversal. p. 251

The value of currency issued by a revolutionary Mexican Government cannot be determined, for the purpose of a transaction in Baltimore, by the value placed thereon by a decree issued by such Government, undertaking to fix such value. pp. 251-253

Plaintiff vendor not having been in a position to give defendant title in fee, as agreed, until January, he could not claim a default by defendant until that time, and consequently was not entitled to introduce evidence as to the value, in the previous December, of Mexican currency which he had agreed to accept in part payment, but which was not paid otherwise than by the transfer to him of counterfeit money. p. 254

Code, Article 35, Section 17, in regard to the taking of testimony of a non-resident witness by deposition, does not in terms prohibit testimony from being taken while the trial is pending, and this should be left largely to the discretion of the trial court. p. 254

In the absence of any showing in the record as to a rule of the lower court in that regard, it will be assumed that the court, in refusing to permit testimony of a non-resident witness to be taken by deposition while the trial was in progress, acted in conformity with its rule, most courts in the State having rules on the subject. p. 255

That the short note in an attachment suit was in assumpsit, while the contract sued on was under seal, if this could be treated as a case of misjoinder or variance, cannot be reviewed unless the distinct point was raised below, and a prayer seeking to take the case from the jury on the ground of lack of evidence legally sufficient under the pleadings to entitle plaintiff to re-

cover is not sufficient for this purpose, in view of the express provision of the statute (Code, Vol. 3, Art. 5, Section 9A).

p. 256

The question of the variance between the short note and the contract could have been raised by objection to the admission of the contract in evidence, or by prayer specifically referring to this ground of objection, it not constituting a ground for demurrer to the short note, in view of the failure of the latter to refer to the contract. p. 256

That the purchaser of property agreed to pay, as part of the price thereof, 299,000 pesos Mexican currency, requires the payment of genuine Mexican currency, even though the contract provided that he should be under no obligation "to guarantee the value in United States currency of the said Mexican money."

p. 257

Under Section 9, Article 5 of the Code (Rule 4 of Court of Appeals), no instruction shall be deemed defective because of a question of law having been thereby submitted to the jury, unless it appear from the record that an objection thereto for such defect was taken at the trial. p. 259

That the parties expressly agreed that time was of the essence of the agreement and that possession was to be given on a date named, cannot be asserted by the purchaser in an action for the price, if he subsequently accepted from the vendee the assignment of a contract by a third person to convey the land to the latter, with knowledge that the title could not be perfected until after that date. p. 259

Where plaintiff vendor had expressly agreed to procure waivers of the right of redemption from certain holders of leasehold interests and mortgagees, and such waivers had not been delivered or tendered, an instruction, given at the instance of the plaintiff, which failed to refer to this defense in favor of the purchaser, was defective. p. 260

Plaintiff vendor having agreed to pay certain sums advanced by defendant and to procure the waiver of rights of redemption by holders of leasehold interests, he could not demand payment by the purchaser of the stipulated price until he himself performed or tendered performance, even though he had received a

conveyance of the legal title, and it was not sufficient that he was "ready, willing and able to perform," the promises of the respective parties being concurrent or dependent.                    p. 261

The refusal of a prayer of defendant causes no injury if it is substantially the same as an instruction given by the court.

p. 262

*Decided December 9th, 1919.*

Appeal from the Superior Court of Baltimore City (HEUISLER, J.).

The cause was argued before BOYD, C. J., BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and ADKINS, JJ.

*J. Kemp Bartlett* and *Guion Miller,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellant.

*George W. Lindsay* and *J. Royal Tippett,* with whom were *Richard B. Tippett & Son* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

An attachment was issued by the appellee against the appellant on the 12th day of January, 1916, which was disposed of, and the case was tried on the short note, which states that the suit was instituted to recover $29,900.00 due and owing from the defendant to the plaintiff for the value of $299,000.00 (face value) "Carrancistas Constitutional Mexican Currency," which was guaranteed by the defendant to be genuine but which was spurious, false and counterfeit. It is alleged to be the balance due under a contract of sale of property known as the Mount Vernon Brewery in Baltimore City. There are also six common counts in the short note. There was filed with the short note an agreement dated the 10th day of September, 1915, which was executed under seal

by the plaintiff and the defendant, and an account for the
purchase money of the property, as per contract, was attached
thereto for $32,935.00, credited by a mortgage of $12,500.00
and cash of $1,000.00, leaving a balance of $19,435.00,
"which was to be paid under the contract in Carrancistas
Constitutional De Mexican Currency of the value in cur-
rency of the United States of America of $29,900.00."

The defendant filed the general issue pleas in assumpsit,
and afterwards an additional plea of accord and satisfaction.
On October 9, 1918, after a trial lasting several weeks, a
verdict was rendered in favor of the plaintiff for $12,000.00.
A judgment was entered on that verdict, and this appeal was
taken.   Thirty-eight exceptions to rulings on the admissibil-
ity of evidence and one (39th) to those on the prayers are
in the record, which is a voluminous one.   Possession was to
be given under the contract on or before October 10, 1915,
the title was to be clear of all encumbrances and satisfactory
to the Title Guarantee & Trust Company.   The plaintiff
agreed to obtain a proper waiver from the owners of the lease-
hold interest of their right of redemption of a judgment in
some ejectment proceedings which had recently been entered
against them by the Safe Deposit & Trust Company, as
trustee, which owned an annual ground rent of $1200.00 on
the property.   The title was originally in the name of the
appellee, but he had conveyed it to the Baltimore Land Com-
pany, a corporation which he organized, and took a mortgage
on it for $20,000.00.   The Baltimore Land Company sold
the leasehold interest to one William J. Houston, who gave
a mortgage to that company for $17,500.00 and the plaintiff
was to release his mortgage, but it was not released of record.
Houston paid $5,000.00 on the mortgage given by him to the
Land Company—having borrowed it from Mrs. C. H. Gor-
don, to whom he gave a mortgage on the property.   Houston
sold his interest to Richard S. Wolfe, who sold it to Alma
C. Simonpietri.   The appellee told Wolfe the $20,000.00
mortgage must be released at once, and that $5,000.00 of the

mortgage given by Houston had been paid, leaving a total indebtedness on the property of $17,500.00. There was default in the payment of ground rents and taxes and the Safe Deposit & Trust Company instituted an action of ejectment against Mrs. Simonpietri, the appellee, the Baltimore Land Company and Mrs. Gordon, and the plaintiff was put in possession of the property on July 15, 1915, under a writ of possession.

On September 10, 1915, an agreement was entered into between the Safe Deposit & Trust Company, trustee, and the appellee, by which that company sold him all of its rights, title and interest in the property for the sum of $16,000.00, of which $1,000.00 was acknowledged to have been paid in cash, $2,500.00 was to be paid on the final ratification of the sale by the Circuit Court of Baltimore City, and the balance was to be secured by a purchase money mortgage described in the agreement. Reference was made to the ownership of the ground rent by the Safe Deposit & Trust Company and to the ejectment proceedings, as well as a statement that the property was sold subject to the right of redemption by the former owners and their mortgagees, and to existing tenancies as per leases thereto attached. The title was to be good and merchantable and the sale was made subject to ratification by the Court. On September 11th the appellee assigned all of his right, title and interest in the contract and the property therein described to the appellant, and requested the Safe Deposit and Trust Company to report the sale to the appellant and to credit the $1,000.00 paid on account of the purchase price in accordance with the terms of the contract. Below that assignment there is an acceptance under seal by the appellant, dated September 11, 1915, as follows: "I do hereby accept the above assignment and do hereby covenant and agree to perform all of the covenants, terms and conditions of the within contract." Three leases of parts of the improvements on the property were attached to that contract.

The first exception was to the admission of that agreement, the assignment and accompanying papers. We can see

no valid objection to the action of the Court in admitting them, as the papers show what the parties agreed in writing should be done. Nor was there any error in the second, third and fourth exceptions. The fifth was abandoned. There was no error in the sixth or seventh exceptions. The important question in the case was the genuineness of the currency given through the Title Company to the plaintiff by the defendant, and it was incumbent on the plaintiff to show that he had used reasonable means to ascertain whether it was genuine. He testified that he went to Mexico and made inquiries of various parties about the bills, which had been given to him. The defendant first put up 133,000 pesos with the Title Company November 15, 1915, and he was to pay the Trust Company $2,500.00 when they were ready to deliver title to him, and he was to turn over the balance of the 299,000 pesos. In March, 1916, 100,000 pesos, which Mr. Fairbank had delivered to the plaintiff under an arrangement between him and the defendant, were returned to Mr. Fairbank, attorney for the Title Company, and Mr. O'Dunne, who was then counsel for the defendant, excepting a few which were held as samples.

There was no error in the eighth exception. It was wholly immaterial what capital stock the Baltimore Land Company had outstanding. We do not understand any reason for the plaintiff objecting to the introduction of the letter of H. M. Kerr to the Title Company, dated January 24, 1916, or how the defendant could have been injured by its being ruled out. Without giving other reasons, it is sufficient to say that that letter was subsequently introduced in evidence, and read to the jury without objection. There was, therefore, no reversible error in the ninth exception. Nor do we see how any injury could have been done the defendant by the admission in the tenth exception of the application of the defendant to the Title Company for a title insurance policy. There is likewise no reversible error in the eleventh exception, which was taken to the admission of a plat of the property in question.

The twelfth exception was likewise without merit. Mr. Fairbank had in a previous part of his evidence said that he did not know of any other papers except the contract. That was admitted without objection, and hence even if the evidence embraced in this exception had been stricken out, the former testimony would have been before the jury. In addition to that, the testimony was given without objection, and, if it was inadmissible, it should have been objected to at the time it was offered, as no reason is shown why its inadmissibility could not have been known at the time it was offered. Without regard to those reasons, however, which may be said to be technical, we are not prepared to hold the evidence inadmissible. Mr. Fairbank was, it is true, attorney for Mr. Rasst part of the time, but for the most part he was acting for the Title Company, and there is nothing in the record to show that he disclosed any confidential communications between him and Rasst. Without deeming it necessary to enter into a discussion of the subject, we will refer to 4 *Wigmore on Evidence,* sections 2290 to 2329, inclusive, and particularly Section 2297, where it is said: "The circumstances of each case must affect the result, but in general a strict construction is the proper one, especially in those cases where attorneys combine the occupation of real estate and insurance brokers or act as executive officers of a corporate business." It would be carrying the doctrine of privilege to an unreasonable extent to hold that the evidence sought to be stricken out in that exception was inadmissible under the circumstances of this case. There is nothing in *Crane* v. *Barkdoll,* 59 Md. 538, cited by appellant, or other cases in this State, in conflict with that conclusion.

There was no error in the thirteenth or fourteenth exception. It was admissible to show that the time for the owners of the leasehold interest to redeem had expired on March 9, 1916, when an agreement between the parties in reference to the Mexican currency was made. If so, it would not be very material whether the deeds which Mr. Fairbank

had in his possession were recorded. There may be some question whether that was the way to prove it, but as the fact was that the time had expired, there was no reversible error in the fifteenth or sixteenth exception. Moreover, the answer to the question in the sixteenth is not in the record. The seventeenth and eighteenth exceptions can be considered together. Alfredo Caturegli's deposition was offered by the plaintiff, and he testified that he was a civil engineer and that he was Consul-General in New York, representing the Carranza Government, in October, 1915, when the defendant called at his office in reference to the sale of some Carranza Constitutional paper; that he was not interested in the purchase of paper, but after examining and making a special note of that shown him, he told the defendant that it looked good, but he could not decide, as he had no authority to pronounce anything regarding its validity, and advised him to send it to Mexico for the proper officer of the Government to decide whether it was good or not. He said that there was a large amount of counterfeit paper in circulation, "and the Government had established an officer, who by decree was named as the only officer authorized to pass on the validity of the paper." He was asked: "Do you know the prevailing prices of exchange for Carranza Constitutional Currency in the months of September, October, November and December, 1915, and January, 1916, in American exchange or American money?" and answered: "Yes, I can say which was the price at the time, based on the documents and decrees from the Government which has established the average price prevailing each month since the year 1913, to the year 1916; in these three years the Government has published a list of the prices that prevailed every month between those dates." He was then asked: "What were the prices prevailing?" and answered: "The prevailing price was, I have seen yesterday, 6½ cents American money, corresponding to 13 cents Mexican money, between 6½ and 7 cents was the price prevailing in the months of September, October and November, and

according with that list of values that has been published officially by the Mexican Government." In the eighteenth exception he was asked: "Doctor, do you know of your own knowledge that the prices which you have mentioned were the prevailing prices for those months in the fall of 1915, based upon exchange for American currency?" and replied: "Yes, I know that of my own knowledge. If you consider the equivalents at par between Mexican money and American money because the prices have been fixed in Mexican money in official prices and have been fixed in Mexican money and the normal rate of exchange is two to one, and that meant that the price was 13 cents Mexican money silver, which corresponds to $7\frac{1}{2}$ cents American money. In other words, it took 13 cents Mexican silver money to amount to 7 cents in American money, or $6\frac{1}{2}$ cents American money," etc. There was error in admitting that testimony. It is apparent that the witness knew nothing about the values of such currency in the months mentioned, excepting from such information as he obtained from the list of prices published by the Government. He said: "The prevailing price was, *I have seen yesterday,*" etc. To accept the value fixed by decree of any Government of its paper money is questionable enough, but to hold that it can be fixed as this witness fixed it, from documents and decrees of a Government which at that time was not even recognized by our Government, and was first at one place and then at another, depending upon the success of its army, would be going very far. Conditions in Mexico at that time are matters of history, well known to the people of this country, and there is evidence in the record that the value of this money was one, two or three cents per peso, sometimes a quarter of a cent—"it all depended on the news they received in Mexico City as the results of the fighting—Carranza was sometimes in Mexico City with his army and sometimes in the mountains in the north of Mexico." It is not definitely shown by whom the documents and decrees were issued, or by what authority

the list of prices was made up. But this transaction was in Baltimore and not in Mexico. Even if the money was required to be accepted at certain prices within the territory then controlled by the Carranza Government, it did not follow that it was of that value in Baltimore or, if there was no market value in Baltimore, in New York or some place where we could properly ascertain its value here.

It is true that by the contract between these parties it was agreed that $19,435.00 was "to be represented by the acceptance of $299,000.00 in Carrancistas Constitutionalista De Mexico Currency," but it was "without any obligation on the part of the purchaser to guarantee the value in U. S. currency of the said Mexican money." Under that agreement payment could have been made with that amount of Mexican currency, whether it was worth 1 cent or 6½ cents per peso. There is evidence in the record that the money was only worth from 2½ to 4 cents in September, and that it went down afterwards. But beyond all that, how can the plaintiff claim that there was a breach by the defendant in September, October, November or December, 1915? The sale by the Safe Deposit Company was not ratified until October 30th, the deed was not made until November 15, 1915. It could not be pretended that there was a default on the part of the defendant before November 1st, as the plaintiff could not give the defendant title in fee, as was agreed, yet this witness was permitted to testify as to values of the pesos in September and October. But that is not all, for the plaintiff has not paid the $2,500.00 or other money he was to pay, inasmuch as the defendant had to pay $2,500.00 to the Safe Deposit Company in part payment for the legal title and had to agree to pay 6 per cent. interest on the mortgage, instead of five which plaintiff had agreed to accept, and some other amounts plaintiff was to pay. He made some arrangement with Mr. Kerr, of Virginia, who sent his check for $2,500.00 in a letter dated November 1, 1915, to the Title Company, to be held in escrow. That

company was authorized by the letter to receive the Mexican currency, "and reasonable opportunity to be afforded said Morris or his representatives for inspection and verification as to the validity of said currency; said inspection to be completed on or before November 21, 1915," and if the inspection was not completed by that time the check was to be returned to Mr. Kerr. There could, therefore, be no default before November 21st, and in addition to that; if the $2,500.00 had been paid without any conditions, it was not sufficient to pay what the plaintiff had agreed to pay. Then until January 15, 1916, the mortgagees and former owners of the leasehold interest could redeem. Up to that time the plaintiff had not so far performed his part of the contract, or shown that he had offered to perform it, as to put the defendant in default. We do not find that any deed or waiver from Mrs. Gordon was executed, or at least tendered to the defendant or the Title Company. The value of the Mexican currency was, therefore, clearly not to be fixed as of September, October, November or December, and the testimony was inadmissible. There was then error in the seventeenth and eighteenth exceptions, and in the nineteenth for some of the reasons given in referring to them.

We do not find any error in the twentieth, twenty-first, twent-second, twenty-third or twenty-fourth exceptions, as we think those witnesses were shown to be qualified to testify as experts. The statement of the witness in the twenty-first exception was simply to emphasize the fact that his experience had caused him to give special attention to the Mexican currency. The twenty-fifth exception was to the exclusion of a deposition taken under Section 17 of Article 35 of the Code, pending the trial of the case. It was objected to on the ground that a deposition could not be taken while the case was actually on trial and because sufficient notice was not given. There is nothing in the statute which in terms prohibits testimony from being taken while a trial is pending, and that should be largely left to the discretion of the

trial Court. The greatest difficulty that occurs to us is that the statute provides that depositions taken under that section "shall be treated in all respects as if taken under a commission regularly issued by said Court, and shall be subject to the like exceptions as testimony taken under commission." The rule of the lower Court is not in the record, but most Courts in this State have rules on the subject, and we must assume that the lower Court acted in accordance with its rule. It was stated that the Court adjourned from Wednesday until Monday, and the deposition was taken on Saturday in Washington. As a matter of fact, there could not well have been an interference with the trial. The notice was served on Monday and under the decision in *Walsh* v. *Boyle,* 30 Md. 262, it would seem to have been sufficient. In the absence of the rule of the Court below, or some certificate on that subject, we will not pass on that exception. We do not think that the witnesses referred to in the twenty-sixth, twenty-seventh, twenty-ninth and thirtieth were shown to be such experts as could testify as to the genuineness of the bills presented to them, and there was no error in either of those exceptions. Nor was there in the twenty-eighth, as the question asked was not relevant. We find no error in the thirty-first, thirty-second, thirty-third or thirty-fourth exceptions, and do not deem it necessary to discuss them. We cannot say from the statement in the record what part of Crane's testimony was ruled out, and hence cannot pass on the thirty-fifth exception. We find no error in the thirty-sixth, thirty-seventh or thirty-eighth exception. This brings us to the rulings on the prayers, presented by the thirty-ninth exception.

The defendant offered nine prayers, all of which were refused, and the Court gave three instructions of its own. The first prayer of the defendant sought to take the case from the jury on the ground that the plaintiff had offered no evidence legally sufficient under the pleadings to entitle the plaintiff to recover. The pleadings are peculiar. The contract is under seal, and the short note is in assumpsit. It does not

refer in terms to the contract, but when it was offered the record speaks of it as "which is attached to the declaration," and the defendant filed the general issue pleas in assumpsit. There was no demurrer to the short note and no motion in arrest or other action taken by reason of the contract being under seal, nor was there any objection to the introduction of it. Indeed, as the short note did not refer to the contract, it could not well have been demurred to, but the question might have been raised by objecting to the admission of the contract in evidence, or by prayer specifically referring to the ground of objection. If it could be treated as a misjoinder, the distinct point should have been raised below, in order to have it reviewed by us, 1 *Poe,* Sec. 286, and Sec. 9-A of Article 5 of the Code (Vol. 3), is that "The fact that a prayer or instruction which refers in general terms to the pleadings was granted or refused by the Court below shall not be sufficient to show that the point or question of a variance between the pleadings and the evidence was tried and decided in the Court below, as required by Section 9; and the question of such variance shall not be considered as having been raised by any prayer or instruction below, unless such prayer or instruction shall state specifically the points wherein it is claimed that such variance exists." Section 91-A of Article 75 (Vol 3) in reference to prayers as to the legal sufficiency of evidence does not relieve the difficulty. So this prayer is not sufficient to raise the question of misjoinder or variance.

Both parties apparently conducted the trial on the theory that this was not a suit on the written agreement, but that it was only used to show the obligation of the defendant to make the payment claimed to be due, as was allowed in *Fry* v. *Talbott,* 106 Md. 43. The arrangement between the parties is presented in a somewhat confused manner by reason of the two contracts of September 10, 1915—the one between Morris and Rasst and the other between the Safe Deposit and Trust Company and Morris, which was assigned

to Rasst by Morris and accepted and assumed by Rasst, as
hereinbefore referred to. The plaintiff, as shown by the ac-
count filed and the short note, evidently proceeded on the
theory that there was nothing to be done by the defendant
except to pay the balance of the purchase money, as repre-
sented by the 299,000 pesos, and that he, the plaintiff, was
to repay the $2,500.00 and other sums when the Mexican
currency was delivered. It is not necessary to cite authori-
ties to show that the contract required the Mexican currency
to be paid by Rasst to be genuine, for if it was not genuine,
it was not such currency. It was only provided in the agree-
ment that Rasst was not under obligations "to guarantee the
value in U. S. currency of the said Mexican money." So
without discussing the evidence more fully, we are of the
opinion that the defendant's first prayer was properly re-
jected. We will refer to the question relied on by the appel-
lant that it should have been granted by reason of the waivers
of the right of redemption not having been delivered to the
defendant before the suit was brought and some other alleged
defaults of plaintiff in connection with the Court's instruc-
tions, which we will pass on before discussing the other pray-
ers offered by defendant, as some of them are covered by
those instructions.

The Court's first instruction was divided into seven para-
graphs, which, for convenience of reference, we will mark
(*a*), (*b*), (*c*), etc., although not so marked by the Court. It
submitted to the jury to find, (*a*) that the plaintiff and de-
fendant executed the contract of September 10, 1915; (*b*)
that after the execution of that agreement, and while it was
subsisting, the plaintiff entered into the contract with the
Safe Deposit and Trust Company; (*c*) that the latter was
assigned by the plaintiff to the defendant and was accepted
by him, and that under that the defendant acquired the fee-
simple title to the property which the plaintiff contracted and
agreed to sell to the defendant; (*d*) that the contract with

the Safe Deposit Company was had by the plaintiff and assigned by him to the defendant who accepted it for the purpose of perfecting in himself a good and marketable title to the property, which he had agreed to purchase under the terms of his contract, then subsisting, if the jury so find; (e) that after the defendant accepted the assignment of the contract between plaintiff and the Safe Deposit Company, the defendant assumed the performance of it, and complied with the terms thereof and thereunder paid to that Company $2,500.00 in cash, mentioned and set out in said contract, "and under said contract acquired the fee-simple title to the property which the plaintiff had contracted and agreed to sell to him under the first contract"; (f) that the defendant after acquiring the title to said property did not deliver to the plaintiff the 299,000 pesos in Carrancistas Constitutionalista De Mexico Currency as provided for and set out in the agreement of purchase and sale of September 10, 1915; (g) that the plaintiff was ready, willing and able to perform all of the terms of the agreement of September 10, 1915, "then the plaintiff is entitled to recover from the defendant, in this action, such sum as the jury may find from the evidence was the fair market value of said 299,000 pesos in Carrancistas Constitutionalista De Mexico Currency, at the time the same should have been delivered to the plaintiff under the terms of the agreement of September 10, 1915, between the plaintiff and the defendant, offered in evidence, which time was when the deed for said property was delivered to the defendant, with interest on said sum in the discretion of the jury, less the sum of twenty-five hundred dollars in cash, which was paid by the defendant to the Safe Deposit and Trust Company of Baltimore, trustee, and less such other credits, as the jury may find, the defendant is entitled to receive by reason of accepting and assuming the contract between the plaintiff and the Safe Deposit and Trust Company of Baltimore, trustee, offered in evidence in this case."

It is urged that the instruction is erroneous for a number of reasons. One of those dwelt on by the appellant at some length, is that it submits questions of law to the jury. For instance, he refers to the statement that under the assigned contract the defendant acquired a fee simple title to the property. It is sufficient to say that under Section 9 of Article 5 of the Code (Rule 4 of this Court) no instruction shall be deemed to be defective "because of a question of law having been thereby submitted to the jury, unless it appear from the record that an objection thereto for such defect was taken at the trial." There is no special exception in this record, and the authorities on the subject are too numerous to require us to refer to any of them, other than those in the note to that section in *Bagby's Code.*

Nor do we think that the objection that it does not submit to the jury the question whether the defendant got all of the property that he was to get is a valid one. There was some evidence that a Mr. Currier showed him more property than he received, and that some of the improvements were beyond the lines, but the instruction does refer to the property which the plaintiff agreed to sell, and, moreover, the contract with the Trust Company had a plat attached. There is nothing in the objection that it overlooked the provision in the contract between the plaintiff and the defendant that "Time is of the essence of this agreement. Possession is to be given on the day of the transfer, which is to be on or before October 10, 1915." He knew that the sale by the Trust Company could not be perfected by that time, as by that contract, which he accepted, the sale was subject to ratification by the Court, and the property was to be conveyed subject to the leases attached to the contract—one of which did not expire until November 13th. But beyond that, there is conclusive evidence showing that such provisions were waived by him, and he had not complied with his part of the contract until long after the above date.

We are of the opinion, however, that the instruction was defective in that no reference was made to the waivers of

redemption by the owners of the leasehold and the mort-
gagees. The waivers were never delivered nor tendered to
the defendant. The Title Company held the deed from Mrs.
Simonpietri and husband to the Baltimore Land Company,
dated October 14, 1915, and one from the Baltimore Land
Company to the defendant, but Mr. Fairbank testified that
the former was delivered to him by the Baltimore Trust Com-
pany, which was acting for the Simonpietris, subject to the
condition that the plaintiff must first pay the sum of $200.00
to that company. The record does not show that Mrs. Gor-
don ever delivered a waiver, even to the Title Company.
Unless such requirement was waived, the defendant was not
required to pay the plaintiff the 299,000 pesos when he re-
ceived the deed from the Safe Deposit Company. Even if it
be conceded that after the expiration of six months from July
15, 1915, when that company was put in possession of the
property under the ejectment proceedings, it was not neces-
sary for the plaintiff to deliver those waivers, the title of
the defendant was not good, or in accordance with the agree-
ment between him and the plaintiff, before January 15,
1916, and unless the delivery of them was waived the plain-
tiff could not recover in this suit brought before that date.
But the Court's first instruction did not submit any question
of a waiver to the jury, but instructed them that the plaintiff
could recover the market value of said 299,000 pesos at the
time when the deed was delivered to the defendant, with
interest in the discretion of the jury, if they found what was
stated in the instruction. That was error, and probably very
injurious error, as there may have been, and was according
to some of the evidence, a difference between the value of the
pesos in January, 1916, from that on November 15, 1915,
when the deed was delivered. The instruction did not in-
form the jury where the market value was to be fixed. Some
other objections have been urged against this instruction but
the most serious one, and the only additional one that we
will refer to, is that the Court after submitting the questions

referred to above as (*a*), (*b*), etc., instructed them in (*g*):
"And if they further find from the evidence, that the plain-
tiff was ready, willing and able to perform all the terms of
the agreement with the defendant of date September 10,
1915, and offered in evidence, then the plaintiff is entitled
to recover," etc.   It must be remembered that by that agree-
ment the plaintiff had agreed to sell the property in fee, to
obtain a proper waiver from the owners of the leasehold
interest of their right of redemption and that the title was
to be free from all encumbrances.   Yet when the title was
examined, it was found that the plaintiff had no title, that
at the time the agreement was made, the Safe Deposit &
Trust Company was in possession under the ejectment pro-
ceedings—not a word of which was in the agreement between
plaintiff and defendant.   The defendant was required to pay
in cash $3,500.00, in our currency, under the agreement with
the Safe Deposit Company and only $1,000.00 under the
original agreement.   He could not safely make improvements
on the property as long as the owners of the leasehold prop-
erty, or their mortgagees, could redeem.   The plaintiff had
agreed to pay the $2,500.00 and other sums, and the defend-
ant could not be required to pay the 299,000 pesos until the
plaintiff performed or tendered performance.   It was not
enough to tell the jury that if the plaintiff was *ready, willing
and able to perform* he could recover.   They were what are
called "Dependent Covenants or Promises."   It is said in 13
*C. J.* 627, Section 694: "Where promises which form the
consideration for each other are concurrent or dependent, the
failure of one party to perform will discharge the other, and
one cannot maintain an action against the other without show-
ing performance, or a tender of performance, on his part,
unless such performance has been excused. * * * Where acts
are to be performed by each party at the same time, neither
party can maintain an action against the other without per-
formance or tender of performance, on his part."   Amongst
the numerous cases cited in the note is *Coates* v. *Sangston,*

5 Md. 121, in which it is said on page 133: "It is impossible that the law can sanction a recovery on the ground of contract, when the claimant has neither performed his part of its stipulations nor shown any reason for his non-performance." As stated in 1 *Pet.* 465: "If either a vendor or a vendee wish to compel the other to fulfill his contract, he must make his part of the agreement precedent, and cannot proceed against the other without an actual performance of the agreement on his part, or a tender and refusal." In *Hill* v. *Grigsby,* 35 Cal. 656, the rule is thus stated: "Performance, or an offer to perform, on the one part, is a condition precedent to the right to insist upon performance on the other part." In *Cincinnati, etc., R. Co.* v. *Baker,* 130 Ill. App. 414, it is said the party must allege and prove "that he, himself, has performed all the conditions of the contract by him to be performed, or that such performance has been waived, and that such other party is in default." Without further discussion of that instruction, we are of the opinion that there was error in giving it.

Defendant's second prayer is the same substantially as the Court's third instruction, and hence no injury was done by refusing it. The object of the modification of the defendant's third prayer in the Court's second instruction is not altogether clear. We do not see any special objection to the modification, as we understand it, if the fifth prayer of the defendant had been granted, as we think it should have been. The defendant's fourth prayer was properly rejected, but his fifth should have been granted, as indicated above. It had an additional qualification, which the defendant was entitled to have submitted to the jury—that the currency was subsequently retired from circulation by action of the Mexican authorities, of which there was evidence. The defendant's sixth and eighth prayers should have been qualified by some such expression as "unless they further find that the defendant had waived the requirement to obtain such releases or waivers," and as drawn were properly refused. There was.

evidence sufficient to have that submitted to the jury. We had in mind the question of waiver by the defendant of the requirement in reference to the releases or waivers of the right of redemption, when we were considering the defendant's first prayer. As the suit was brought before the six months had expired, we had some question as to whether it could be maintained, but we concluded that there was sufficient to go to the jury as to whether the defendant had before the suit waived that requirement. As Mr. Fairbank was only authorized to file the order for dismissal upon the execution of an agreement which was prepared but never executed by the parties, he had no authority to file the order and the seventh prayer was properly rejected. As we do not find sufficient evidence upon which there could have been a recovery on any of the common counts in the short note, we are of opinion that the ninth prayer should have been granted.

As this opinion is already unusually long, by reason of the many exceptions to be considered and the great bulk of testimony, we will not discuss other questions. The trial below was a long and doubtless expensive one, and we regret the necessity for the reversal of the judgment, but the conclusions reached by us require us to reverse the judgment on account of the errors in the seventeenth, eighteenth and nineteenth exceptions and in granting the Court's first instruction, and in rejecting the defendant's fifth and ninth prayers.

*Judgment reversed and new trial awarded,*
*the appellee to pay the costs.*